CONTRA COSTA COUNTY FLOOD CONTROL AND WATER CONSERVATION DISTRICT

v.

The UNITED STATES.

No. 392–73.

United States Court of Claims.

March 19, 1975.

E. V. Lane, Jr., Martinez, Cal., atty. of record, for plaintiff.

Bernard M. Brodsky, Court of Claims Sec., Civil Div., Dept. of Justice, Washington, D. C., with whom was Asst. Atty. Gen. Carla A. Hills, for defendant.

Before DAVIS, KASHIWA and KUNZIG, Judges.

DAVIS, Judge.

In the 1960's the Soil Conservation Service of the United States Department

of Agriculture made agreements (under the Watershed Protection and Flood Prevention Act, 68 Stat. 666, 16 U.S.C. § 1001 et seq.) with plaintiff Contra Costa County Flood Control and Water Conservation District, an agency of California, to fund (in large part) and to supply technical assistance for the construction of a channel improvement project in Marsh Creek within Contra Costa County. The Flood Control District was to supervise the construction which was to be performed by Oscar C. Holmes, Inc. (Holmes), a private contractor. After completion of the work Holmes made large claims against the plaintiff which were administratively rejected. Suit was then brought by Holmes on these demands, in 1968, against the Flood Control District in a California state court. The present action concerns, not the details of the Marsh Creek project or the validity of Holmes' claims, but a separate agreement made by plaintiff and the Soil Conservation Service with respect to the legal fees for defending Holmes' suit against the District.

Shortly after Holmes filed its action, the Service and the District made this attorneys-fees contract which declared, in a significant "whereas" clause, that "any judgment in favor of the contractor [Holmes] resulting from such action may result in an increase in the cost of construction of said works of improvement for which the Service will be obligated to cost-share with the Local Organization [the Flood Control District] as an additional cost of construction," and then proceeded to arrange for the incidence of the lawyers' costs.[1]

At the suggestion and with the approval of the Conservation Service, plaintiff retained a local attorney to represent it in the Holmes litigation. Bills reflecting this lawyer's fees and expenses were submitted by the Flood Control District to the Service which regularly reimbursed the District for them, under the agreement respecting legal expenses, until in September 1970 the Service indicated, for the first time, that it would not pay the plaintiff after the supposed "limitation" of $35,000 was

1. The relevant parts of the operative provisions of the contract are as follows:

\* \* \* \* \* \*

"A. This agreement relates to the employment of Attorneys to represent the Local Organization [the District] in the defense of said lawsuit.

"B. The Local Organization will:
1. Employ Attorneys satisfactory to the [Soil Conservation] Service.
2. Permit the Service to participate to the extent it deems advisable in the preparation for and the trial of such lawsuit, and exercise the right of appeal in such lawsuit if requested to do so by the Service.
3. Prepare and submit itemized billings to the Service covering fees and expenses payable monthly to the Attorneys, and make payments to the Attorneys.

"C. The Service will:
1. Provide 100 percent of the actual cost of the fees and expenses of the Attorneys which have been approved by the Local Organization, with the concurrence of the Service, based on the following fee and expense schedule.

*Attorneys' Fees:*
$40 per hour, including trial time for Attorney in Charge.
$10 to $25 per hour for each assistant, depending on their experience. Said sums to

be computed on basis of one-quarter hour.
*Expenses:*
Transportation by public carrier.
Subsistence and lodging not to exceed $16 per day.
Personal vehicle mileage at $0.10 per mile.
Costs and disbursements for litigation, including expert witnesses.
Costs for depositions and transcripts.
The above fees and expenses, estimated to be $35,000 shall be itemized and verified by the Attorneys and be supported by proper vouchers or billings.
2. Upon receipt of vouchers or billings, if acceptable, make monthly payments to the Local Organization.

"D. It is mutually Agreed that:
1. The employment agreement between the Local Organization and the Attorneys will be approved by the Service before it is executed; and such agreement will be terminated by the Local Organization only upon the request of the Service.
2. No fees or expenses incurred by the Attorneys in connection with the defense of said lawsuit will be approved for payment by the Local Organization without the concurrence of the Service."

\* \* \* \* \* \*

reached. Thereafter the Service paid the legal bills up to the total of $35,000 but refused any further reimbursement, although the District consistently submitted bills for approval in ordinary course. The Service insisted that the plaintiff should pay the bills itself.

The total of legal fees and expenses incurred by plaintiff up to the commencement of the present action (in October 1973) is $58,856.14, of which defendant has reimbursed only $35,000.[2] Plaintiff now seeks the remainder ($23,856.14).[3]

Stressing the contract's repeated references to governmental approval and concurrence (see footnote 1, supra), defendant takes the position that either (a) the Conservation Service had at all times the plenary and untrammeled right to refuse to pay for legal fees and expenses whenever it decided not to, or (b) at least beyond the so-called "maximum" of $35,000, the Government had that right which it could exercise in its unreviewable discretion. This interpretation, it is said, is the more reasonable construction of the contractual language, and the one which retains in the Government the full right of control which it was the purpose of the agreement to accord.

We cannot accept either of these readings which are contradicted, it seems to us, by the dominant themes, the terms, the structure, and the background of the fee agreement. The Government's primary interest and the main reason why the pact was made are clearly reflected in the "whereas" clause we have quoted above—"any judgment in favor of the contractor [Holmes] resulting from such action may result in an increase in the cost of construction of said works of improvement for which the Service will be obligated to cost-share with the Local Organization [the plaintiff] as an additional cost of construction." In March 1968 when the agreement was signed shortly after Holmes filed his suit, the United States considered that it might very well have to pay a goodly portion of a judgment favoring Holmes. For that reason it desired, as a potential co-payor, substantial control over the defense of the action—but by the same token it knew it was in the same boat as plaintiff and they would have to float or sink together. The Government's participation was neither charity nor a mere gratuity. It was, rather, the recognition of a common financial interest. Those are the twin principal threads of the contract—the fortunes of the Conservation Service with respect to the Holmes litigation were directly tied to those of the Flood Control District, and at the same time the Government, since it was to bear the legal costs and be responsible for part of any adverse judgment, was to have important input into and control over the conduct of that litigation.

These fundamental purposes are carried over into the contract's terms—what they say and what they omit to provide. Federal control is obviously assured by the provisions that (a) the attorneys have to be satisfactory to the Conservation Service (paragraph B. 1., supra, footnote 1); (b) the attorney's employment agreement must be approved in advance by the Service (paragraph D., 1.); (c) the legal fees and expenses have to be approved by the Service as proper (paragraphs C., 1.; D., 2.); (d) the attorney's contract cannot be terminated by the District alone, but only if the Service so requests (paragraph D., 1.); and (e) the Service can participate in the Holmes litigation "to the extent it deems advisable," including the right to call for an appeal (if necessary) (paragraph B., 2.).

These are significant rights, but all are quite consistent with the view that,

---

2. The Holmes lawsuit, which initially sought $600,000, was settled in September 1972 for $150,000, payable by the plaintiff. The present action does not involve any question as to the propriety of this settlement or the share, if any, to be borne by the Conservation Service.

3. Plaintiff first sought relief through an appeal to the Board of Contract Appeals of the Department of Agriculture. That tribunal dismissed the appeal for lack of jurisdiction. The legal-expenses contract does not contain a Disputes clause or provide for administrative settlement of controversies.

in exercising them, the Federal Government could not wash its hands of the litigation and leave the District to sink or swim alone. The United States had the upper hand because it was to bear the expense, but it is implicit that it also undertook not to leave the District in a lurch but to see the litigation to its end.[4] We think this is shown, negatively, by the absence of any form of termination clause in the contract,[5] and, affirmatively, by the combination of the provisions that the Service was to pay "100 percent of the actual cost of the fees and expenses of the Attorneys which have been approved by the Local Organization, with the concurrence of the Service" (paragraph C. 1.), and that the Service could take over the whole defense of the lawsuit, including the removal of the attorneys hired by the plaintiff (paragraphs B. 2.; D. 1.). The United States was not required to pay outside legal costs if it considered that they were mounting too high, but its alternative was to assume the suit's defense—not to withdraw from the arena, as it did, and allow the District to incur and pay the legal costs for itself as if the District alone were concerned with the outcome.

In response, defendant stands squarely, first, on the provision that the legal fees and expenses are "estimated to be $35,000" (paragraph C. 1., end), which the Government takes to be the upper limit of its mandatory responsibility; and, second, on the several indications that the Service has to approve or accept or concur in the legal costs, if they are to be paid (paragraphs C. 1.; C. 2.; D. 2.). In literal terms the $35,000 clause does not impose a maximum or say any more than that that amount was then anticipated as the total, and there is in-

sufficient ground for expanding it to establish a definite maximum for the responsibility of the United States. The record contains no authoritative or even satisfactory explanation for its inclusion,[6] and to read it as an upper limit on the participation of the Federal Government alone would run directly against paragraph D. 2., which prohibits the plaintiff from paying the lawyers any fees or expenses "without the concurrence of the Service." If $35,000 was a maximum, it was necessarily a restriction for the District as well as for the Service—but this was certainly not the position taken by the Service when it reiterated that the District alone was to bear the excess. And if $35,000 was such an overall limitation, then it would seem that the Service should have called for the termination of the lawyers' contract (paragraph D. 1.) and itself taken over the defense of the Holmes action (paragraph B. 2.). Otherwise the District would have been left foundering, contrary to one of the prime purposes of the agreement which was to tie the plaintiff and the Service securely together.

As for the references to Service concurrence, approval or acceptance, they are easily understood as calling upon the Government to monitor the claimed legal fees and expenses for excessiveness, needless expenditures, insufficient proof, etc. The usual standard is that concurrence or approval is not left to unbridled discretion but can be withheld only if objectively reasonable in the particular circumstances, particularly when the item contracted for is not one which can be evaluated only on the basis of personal taste or fancy. *See, e. g.* Ard Dr. Pepper Bottling Co. v. Dr. Pep-

---

4. Seeing the Holmes litigation through to its end would not, of course, preclude a settlement, which is one important form of ending a lawsuit.

5. Defendant admits that there is no explicit termination clause of any kind but argues that exercise of the right not to approve legal expenditures is the equivalent of a privilege to terminate at will. As we point out *infra*, that is not the normal interpretation of a mere

right-of-approval, and in this instance it would be inconsistent with the dominant purposes of the agreement.

6. An affidavit by an employee of plaintiff suggests that $35,000 "represented the amount of money allocated to other projects which could be diverted and made available at the time of said Agreement [the contract in suit] to finance the defense of the Holmes' litigation."

per Co., 202 F.2d 372, 377 (C.A. 5, 1953); 5 Williston Contracts § 675B (3d ed. 1961). The concurrence requirements in this case lend themselves readily to that interpretation. The United States was to be in a position to prevent itself from being "taken for a ride" by excessive or unnecessary outlays,[7] but it was not to be free to reject necessary and reasonable legal expenditures—unless it was willing to end the private attorneys' services and itself assume the defense of the Holmes case.[8]

■ We think that in this way the separate provisions of the agreement can be harmonized with its major purposes, so as to hold the United States to its original undertaking, in March 1968, not to jettison the District whenever it might decide to do so.[9] Bilateral contracts should be applied, if fairly possible, so as not to put one side at the mere will or mercy of the other. Padbloc Company v. United States, 161 Ct.Cl. 369, 376–77 (1963); Deloro Smelting & Refining Co. v. United States, 317 F.2d 382, 387, 161 Ct.Cl. 489, 496–97, (1963).

This coordination of the various terms of the agreement seems to us distinctly preferable, even without the *contra proferentem* rule, to the Government's understanding that it had all (or nearly all) the rights and practically no responsibilities. But if the contract be deemed more ambiguous and less clear, then the usual canon should be invoked. Sturm v. United States, 421 F.2d 723, 727, 190 Ct.Cl. 691, 697 (1970). The Government presented plaintiff with the form of the agreement, and the plaintiff's interpretation was at least reasonable, if not in fact the better one.

■ The plaintiff's motion for summary judgment is granted, the defendant's is denied, and plaintiff is entitled to judgment. We return the case for further proceedings under Rule 131(c), with respect to the amount of recovery, because defendant, which has hitherto rested wholly on its alleged unqualified right to refuse reimbursement,[10] may possibly wish to question the propriety or necessity of some of the expenditures.[11]

---

7. In providing that even the District could not pay the lawyers any fees or expenses without the Service's concurrence, paragraph D. 2. strongly supports the conception that the provisions for concurrence-approval-acceptance were designed to keep legal costs within proper bounds, not to accord the Service an unchecked discretion to reject reasonable costs.

8. The contract in Northwest Marine Iron Works v. United States, 493 F.2d 652, 203 Ct.Cl. 629 (1974)—on which defendant relies—made it absolutely clear that the Government had the plenary right to decide whether a certain type of insurance should be purchased by the contractor or whether the Government would itself assume the risk of loss. 493 F.2d at 656–57, 203 Ct.Cl. at 636–37. Even if we discount the plain difference in wording, the decision does not at all support defendant; the analogy to the current case is that the Soil Conservation Service had the election to pay reasonable and proper legal costs or to take over the defense of the Holmes suit. In fact it chose to do neither.

9. There is some indication in a letter from an Assistant Secretary of Agriculture, in April 1972, rejecting the District's request for payment that by that date the Government had concluded, from the ongoing development of the grounds of the Holmes litigation, that even if Holmes obtained a judgment the Government would not be liable to the District for any part of it.

10. There has been no suggestion, thus far in this lawsuit, that any of the expenditures in suit were improper.

11. Plaintiff asks for interest but neither the contract nor any statute provides for it in this instance, and it cannot be allowed. United States v. Thayer-West Point Hotel Co., 329 U.S. 585, 67 S.Ct. 398, 91 L.Ed. 521 (1947).