720 F.2d 78
 231 U.S.App.D.C. 314
 PACIFIC GAS AND ELECTRIC COMPANY, Petitioner,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent,
Calaveras County Water District, Northern California Power
Agency, Intervenors.
CALAVERAS COUNTY WATER DISTRICT, Petitioner,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent,
Northern California Power Agency, Pacific Gas and Electric
Company, Intervenors.
NORTHERN CALIFORNIA POWER AGENCY, Petitioner,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent,
Calaveras County Water District, Pacific Gas and Electric
Company, Intervenors.
 Nos. 82-2021, 82-2026 and 82-2030.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued April 27, 1983.
Decided Oct. 11, 1983.
 
 Petitions for Review of Orders of the Federal Energy Regulatory commission.
 Jack F. Fallin, Jr., San Francisco, Cal., with whom Gail A. Greely and Louis E. Vincent, San Francisco, Cal., were on brief, for Pacific Gas and Elec. Co. Petitioner in 82-2021 and intervenor in 82-2026 and 82-2030. Daniel E. Gibson, San Francisco, Cal., also entered an appearance for petitioner and intervenor.
 Robert C. McDiarmid, Washington, D.C., with whom Frances E. Francis and Marc R. Poirier, Washington, D.C., were on joint brief for Northern California Power Agency. Petitioner in 82-2030 and intervenor in 82-2026 and 82-2021. Nancy E. Wiegers also entered an appearance for intervenor.
 Christopher D. Williams, Washington, D.C., was on joint brief for Calaveras County Water Dist. Petitioner in 82-2026 and intervenor in 82-2030 and 82-2021.
 Joshua Z. Rokach, F.E.R.C., Washington, D.C., with whom Charles A. Moore, Gen. Counsel and Barbara J. Weller, Deputy Sol., Washington, D.C., were on brief, for respondent.
 Before GINSBURG and SCALIA, Circuit Judges, BAZELON, Senior Circuit judge.
 Opinion for the Court filed by Circuit Judge GINSBURG.*
 GINSBURG, Circuit Judge:
 
 
 1
 The Federal Power Act (FPA), 16 U.S.C. Secs. 791a-823a (1976 & Supp. V 1981), directs the Federal Energy Regulatory Commission (FERC, or Commission) to supervise the development of the nation's navigable water resources and to license the construction and operation of hydroelectric projects on all bodies of water subject to federal jurisdiction.[1] Calaveras County Water District (CCWD), a political subdivision of the State of California, applied to FERC for a license to build a hydroelectric power plant near Modesto, California. CCWD's application was supported by the Northern California Power Agency (NCPA), a joint enterprise of publicly-owned electric systems. NCPA procures electric power on behalf of its members and planned to purchase the power generated at the CCWD plant. On February 8, 1982, FERC granted CCWD a license somewhat narrower in scope than the one described in CCWD's application.[2]
 
 
 2
 The construction and operation of CCWD's plant, as licensed, will have certain adverse impacts on a hydroelectric dam and powerhouses operated by Pacific Gas and Electric Company (PG & E) pursuant to prior license grants. In separate petitions consolidated for review PG & E and CCWD present challenges to FERC's decision. For the reasons set out below we conclude that the Commission's action on CCWD's application reasonably accommodated two principal goals of the FPA: promoting the comprehensive development of waterways subject to federal jurisdiction, and encouraging private investment to effect that development. We therefore affirm the Commission's decision to grant a license to CCWD, subject to the terms and conditions FERC specified to protect PG & E's legitimate interests.
 
 I. BACKGROUND
 
 3
 The North Fork Stanislaus River flows southwestward from Lake Alpine and converges with the main stream of the Stanislaus River near Modesto, California. See map infra p. 82. PG & E, under licenses granted by the Federal Power Commission (FERC's predecessor agency, hereafter not distinguished from FERC), currently operates three hydroelectric facilities in the vicinity of that junction. PG & E maintains a dam and small reservoir at Spicer Meadow (north edge of the map) which is used to control water supplies to two powerplants--the Angels[3] and Murphys[4] powerhouses (shown in the southwest section of the map). PG & E's third facility is the Stanislaus powerhouse[5] (just east of the Murphys powerhouse) which draws on a different source of water.
 
 
 4
 CCWD's project,[6] as originally proposed to FERC, would have had three adverse impacts on PG & E's existing operations.
 
 
 5
 First, CCWD proposed to divert most of the water currently used at PG & E's Angels and Murphys powerhouses to a new, CCWD-operated powerhouse at Collierville (situated between the Murphys and Stanislaus powerhouses, and shown in the southwest section of the map).[7] CCWD asserted that it was prepared to compensate PG & E for the power PG & E would lose, but insisted that FERC had a statutory duty to license CCWD's new project to the full extent CCWD proposed. CCWD's projected diversion would increase the power generated from the water in question. Because CCWD's proposal was "better adapted" to developing the waterway, CCWD claimed FERC was obliged to accept it. For this argument CCWD relied principally on section 10(a) of the FPA.[8] PG & E, on the other hand, maintained that FERC may authorize no encroachment on its licensed operations without PG & E's consent.[9] PG & E placed principal reliance on section 6 of the FPA.[10]
 
 
 6
 Second, CCWD's project would somewhat raise the water level downstream of the Stanislaus powerhouse, and consequently reduce the power PG & E could generate there by about 0.3% of the powerhouse's current output. Again, CCWD expressed a willingness to compensate PG & E for the power lost; PG & E adhered to the position that no adverse impact on its license could be authorized by FERC without PG & E's consent.
 
 
 7
 Third, CCWD proposed to erect a new dam at Spicer Meadow that would substantially increase the size of the existing reservoir at that location, inundate PG & E's Spicer Meadow dam, and destroy PG & E's associated facilities and conduits. CCWD contended that a clause in PG & E's license for the Spicer Meadow dam permitted FERC to authorize the erection of this new dam. PG & E maintained that the clause in question permits only the raising of the old dam, not the erection of a new one.
 
 
 8
 In the license issued to CCWD, FERC resolved these three disputes as follows. First, PG & E is to retain control of the water it currently uses at the Angels and Murphys powerhouses. Second, CCWD is permitted to raise the water level downstream of the Stanislaus powerhouse, but must compensate PG & E for the power lost. The amount of compensation, and the forum for determining it, remain open questions. Third, subject to protection of PG & E's interest in water now channeled to its powerhouses, CCWD is licensed to erect a new dam at Spicer Meadow.
 
 
 9
 NOTE: OPINION CONTAINS TABLE OR OTHER DATA THAT IS NOT VIEWABLE
 
 II. DISCUSSION
 
 10
 The FPA was enacted to establish a systematic, orderly process for promoting the comprehensive development and full use of the nation's navigable waters. Congress' general statement of the FPA's purpose appears in section 10(a), which requires projects licensed by FERC to be
 
 
 11
 best adapted to a comprehensive plan for improving or developing a waterway ... for the use or benefit of interstate or foreign commerce, for the improvement and utilization of water-power development, and for other beneficial public uses, including recreational purposes; and if necessary in order to secure such plan the Commission shall have authority to require the modification of any project and of the plans and specifications of the project works before approval.
 
 16 U.S.C. Sec. 803(a).[11]
 
 12
 The FPA contemplates development through private investment. Chemehuevi Tribe of Indians v. FPC, 420 U.S. 395, 407-08, 95 S.Ct. 1066, 1074, 43 L.Ed.2d 279 (1975). Prior to the FPA's enactment in 1919, licenses to develop hydroelectric power projects on navigable waterways were issued in one of two ways. The Secretary of the Interior could license projects pursuant to legislation enacted in 1901; these licenses were revocable at will. In contrast, individual acts of Congress were used to grant perpetual licenses for specific projects. Secure licenses were thus difficult to obtain; revocable licenses, though more readily available, were of little value to private investors. These conditions, Senator Walsh remarked during the Senate debates on the FPA, made legislation necessary. See 59 Cong.Rec. 1,440 (1920). Accordingly, the FPA was designed to insure that the licenses granted by FERC promote secure licensee expectations.
 
 To this end, section 6 specifies:
 
 13
 Licenses under this subchapter shall be issued for a period not exceeding fifty years. Each such license shall be conditioned upon acceptance by the licensee of all of the terms and conditions of this chapter and such further conditions, if any, as the Commission shall prescribe in conformity with this chapter, which said terms and conditions and the acceptance thereof shall be expressed in said license. Licenses may be revoked only for the reasons and in the manner prescribed under the provisions of this chapter, and may be altered or surrendered only upon mutual agreement between the licensee and the Commission after thirty days' public notice.
 
 
 14
 16 U.S.C. Sec. 799. Correspondingly, the last clause of section 10(a) authorizes FERC to require licensee modifications only "before approval." Related language restricting the licensee's power unilaterally to make changes in a licensed project appears in section 10(b).[12] A final indication of the Sixty-sixth Congress' strong concern that licensees receive reliable grants appears in FPA section 28, which purports to limit the power of future Congresses to amend the FPA in any way that would adversely affect extant licenses.[13]
 
 
 15
 There is some tension between section 10's focus on comprehensive development, and section 6's emphasis on secure licenses. Secure licenses are likely to promote the development of new projects on previously undeveloped waterways. But to the extent FERC's power to alter or revoke licenses is narrowed, the replacement of small or antiquated facilities by larger or more efficient ones may be impeded. Congress judged that on balance secure licenses for terms not exceeding fifty years would more often further than obstruct comprehensive development.
 
 
 16
 FERC's power to limit license agreements and to reserve the right to require future alterations enables the Commission to accord section 6 the scope its terms indicate without unreasonably undermining the FPA's broader purpose set out in section 10(a). FERC has discretion under section 6 to restrict license terms to any period not exceeding fifty years, and is also authorized by that section to impose additional license conditions at its discretion. FERC understands--and has not hesitated to exercise--this discretionary authority. In Duke Power Co., 55 F.P.C. 677, 680 n. 8 (1976), for example, the license agreement expressly reserved the Commission's right to "issue [a subsequent] license authorizing the construction, operation and maintenance of a hydroelectric project which will more completely utilize the water resources" of the river in question.
 
 
 17
 In the case at hand we are called upon to determine first, whether FERC has misconstrued the relevant sections of the FPA, and second, whether FERC's construction of PG & E's Spicer Meadow license is correct. An agency's interpretation of the statute it administers is entitled to deference, Zenith Radio Corp. v. United States, 437 U.S. 443, 450, 98 S.Ct. 2441, 2445, 57 L.Ed.2d 337 (1978), as is its construction of the license agreements it negotiates and oversees. Cf. Andrew G. Nelson, Inc. v. United States, 355 U.S. 554, 558, 78 S.Ct. 496, 498, 2 L.Ed.2d 484 (1958); Alabama Power Co. v. FERC, 584 F.2d 750, 753-54 (5th Cir.1978). But cf. Harrison v. FERC, 567 F.2d 308, 310 (5th Cir.1978) ("The issue is one of document interpretation, a field where plain meaning controls, absent ambiguity or special usage.").
 
 
 18
 A. Diversion of the Angels and Murphys water supplies
 
 
 19
 FERC rejected CCWD's proposal to divert to CCWD's new Collierville powerhouse water now channeled to PG & E's Murphys and Angels powerhouses. PG & E currently generates about 31,000 Megawatt-hours (Mwh) of energy per year using that water; CCWD would use it to generate about twice as much--65,850 Mwh per year. CCWD Initial Brief at 15. FERC urged CCWD and PG & E to pursue negotiations on the matter,[14] but ruled that section 6, applied to the licenses held by PG & E, prevented FERC from authorizing these diversions without PG & E's consent.[15] At oral argument PG & E's counsel informed the court that negotiations have not abated.[16]
 
 
 20
 As a threshold matter, CCWD has not persuaded us that "long established Commission precedents" support its view that FERC must license the better adapted project even if it interferes with a prior license. CCWD Initial Brief at 41-43. In a prior decision FERC has, indeed, stated:
 
 
 21
 The Commission's comprehensive licensing authority is not restricted by any rights of existing licensees to be free of encroachment from a new project where the Commission finds that the resulting totality of river development, giving full consideration to any negative effects of the encroachment, is most conducive to comprehensive development.... Where the record indicates that such an encroachment will significantly impair the operational value of the existing project, the Commission has included a provision in the new license requiring it to compensate the existing licensee for the loss.
 
 
 22
 Susquehanna Power Co. & Philadelphia Electric Power Co., 32 F.P.C. 826, 831 (1964) (footnotes omitted). The Commission reiterated this view in Duke Power Co., 55 F.P.C. 677, 681 (1976). Neither of these cases, however, involved a non-consensual interference.
 
 
 23
 The quoted language from Susquehanna is pure dictum,[17] as FERC itself tacitly acknowledged in that case. "We do not have any question here of compensation to [the prior licensee] for damages to its licensed operations by [the new project]; as conditioned as set forth above, there will be none." 32 F.P.C. at 832. In Duke Power FERC overruled a licensee's objection to a license agreement clause in which the Commission reserved the right to authorize future interference with the licensed project. Again, there was no question of a non-consensual encroachment on existing operations. At oral argument CCWD conceded that it could identify no prior case in which FERC had allowed a new license to encroach on an old one in circumstances where the old licensee did not tacitly or explicitly acquiesce in the encroachment or agree to a negotiated settlement.
 
 
 24
 On at least one prior occasion FERC has refused to license a project that would have substantially reduced water supplies to existing licensees. In North Kern Water Storage District, 16 FERC p 61,082 (1981), FERC squarely addressed--and rejected--a new applicant's assertion that under section 10(a) the Commission is obliged to license a subsequent, "better adapted" project regardless of the adverse impact on a prior licensee. The Commission's decision with respect to the Angels-Murphys water dispute is entirely consistent with that precedent.
 
 
 25
 Turning from Commission precedent to the FPA itself, CCWD relies primarily on FPA section 10(a) to support its claim that FERC should have licensed CCWD's "better adapted" project in its entirety, without regard to the adverse impacts on PG & E's existing licensed facilities. CCWD would derive from this provision a command that FERC reallocate water to a new applicant whenever the applicant demonstrates, as CCWD has, that it will make better use of the water than does the prior licensee. FERC, according to CCWD, has not only the authority, it has a statutory obligation to license the "better adapted" project regardless of adverse impact on prior licensees, subject only a requirement that those licensees receive adequate compensation.
 
 
 26
 We do not find in section 10(a) the firm directive CCWD urges. On the contrary, we cannot gainsay FERC's conclusion that, in the circumstances presented here, section 6 requires rejection of CCWD's position.
 
 
 27
 CCWD overreads section 10(a) and diminishes the policy declared in section 6. Section 6 clearly states: "Licenses may be revoked only for the reasons and in the manner prescribed under provisions of this chapter, and may be altered or surrendered only upon mutual agreement between the licensee and the Commission ...." This appears to dispose of CCWD's claim to the Angels-Murphys water. But CCWD reads section 6 only to prevent FERC from unilaterally imposing on a licensee additional, affirmative obligations not specified in the license agreement. See CCWD Initial Brief at 30, 32-33. This reading finds no support in the specific language of section 6 (which restricts revocation or surrender of a license as well as alteration), no support in other provisions of the Act (which are clearly designed to promote stable licensee expectations), and none in the legislative history.[18] The Act's overarching purpose, all parties agree, is to promote the development of the nation's waterways. Congress determined that development should be financed largely by private investment, and sought to promote that investment by making licenses secure. Section 6 unmistakably reflects that policy.[19]
 
 
 28
 CCWD's counterarguments are insubstantial. CCWD concedes that the FPA attaches importance to secure licenses,[20] but suggests that the purpose of section 6 is achieved equally well, and more consistently with the FPA's larger purpose, by a requirement that displaced licensees receive adequate compensation when a new, "better adapted" project is approved. This argument is unpersuasive. To potential investors, a right to wrangle in court over compensation is likely to be a less attractive drawing card than a hydroelectric project reasonably secure from regulatory interference. And no provision of the FPA sets up inter-licensee compensation as an alternative to the protections specified in section 6 against unilateral license revisions by FERC. Neither section 10(c), nor section 21, both cited by CCWD in support of its compensation theory, can reasonably be read to do so.[21]
 
 
 29
 CCWD insists, however, that the reading of section 6 we accept will gravely undermine section 10(a)'s focus on projects "best adapted to a comprehensive plan for improving or developing a waterway."[22] Section 6, CCWD argues, should not be read to allow a prior licensee of a tiny project to "veto" a subsequent proposal to develop a much larger project in the same location.[23] The short answer to this argument is that the CCWD-PG & E dispute over the Angels-Murphys water does not present that case.[24] CCWD's project as licensed by FERC, without access to the Angels-Murphys water, has not suffered large diminution as a result of any PG & E "veto." The project can operate at about 90% of the originally-planned capacity: without the disputed water CCWD can generate about 494,000 Mwh of energy per year; with the water, about 560,000 Mwh. CCWD Initial Brief at 15. PG & E is therefore in no position to exploit its status as prior licensee unreasonably to obstruct CCWD's larger proposal.
 
 
 30
 We need not decide whether section 6 affords leeway irrelevant to the present facts. We have earlier noted FERC's ability to write consent requirements into licenses at the time of issuance, and the United States' clear power to overcome the withholding of required consent by condemnation of the project under section 14 of the Act.[25] Nonetheless, it may be that the consent requirement of section 6 is subject to a "reasonableness" safeguard against a licensee's arbitrary refusal to consent, when that refusal would substantially impair the interest of the licensor in effective use of water power.[26] To dispose of the present case, it suffices to say that we decline to enter into assessments of reasonableness where lack of consent does not affect the viability of the subsequent project.[27]B. Impact on PG & E's Stanislaus powerhouse
 
 
 31
 CCWD's project will raise the water level downstream of PG & E's Stanislaus powerhouse by some sixteen feet, and thereby reduce power generated at that plant by about 0.3%. FERC estimates the resultant financial loss to PG & E will be in the range of $14,400 to $52,800.[28] J.A. 740. Notwithstanding PG & E's refusal to consent, FERC judges the 0.3% impact on PG & E's Stanislaus license to be permissible because it is so small. FERC leaves open the possibility of requiring CCWD to compensate PG & E in an amount yet to be determined.[29]
 
 
 32
 PG & E insists that section 6 does not contemplate even a "de minimis" exception--FERC simply may not approve a license that will have any adverse impact on one already issued.
 
 
 33
 In our view PG & E's interpretation of section 6 is not compelled by the language of that section, and is unnecessary to its purposes. PG & E's interpretation would tilt the balance too far in favor of prior licensees, making it possible for PG & E and similarly situated licensees to undermine, perhaps significantly, the FPA's broader objective of encouraging comprehensive development of the waterways.[30]
 
 
 34
 Section 6 states, without qualification, that licenses[31] "may be altered or surrendered only upon mutual agreement between the licensee and the Commission." But the operative term "altered" is not self-defining. It is safe to assume that any new hydroelectric project will have some impact on every other project on the same waterway or in the same geographical area. Water levels or flow rates upstream or downstream may change slightly, drainage into or out of the river may be affected, indeed rainfall in the area might change when a large reservoir is created or removed. Section 6, like most other statutory provisions, must incorporate some common sense limits.[32] Without seeking to define those limits precisely, we are persuaded that an unconsented 0.3% reduction in generating capacity does not amount to a license "alteration" prohibited by the explicit terms of section 6.[33]
 
 
 35
 Section 6's goals are not eroded by this interpretation. Encouraging and protecting private investment in waterway development does not require FERC to disallow every conceivable adverse impact, no matter how slight, on existing licensees. Investor confidence can remain unshaken under a rule that allows the Commission to authorize de minimis interferences with the operation of an existing plant. Small encroachments on a license, comparable in their adverse impact to variations in conditions that investors might expect from other causes such as, for example, annual fluctuations in water supply, should be within FERC's authority to grant in implementing the design of Congress to promote, at the same time, development and stable investment incentives.[34] It is implausible to suggest that a 0.3% reduction in generating capacity precipitated by FERC's approval of a new license constitutes interference of an order that will undermine investor confidence.[35] PG & E's interpretation of the Act, FERC argues and we agree, "would inflate the rights of existing licensees far beyond any needs for protecting their investment or ensuring the continued operation of their projects." Brief for Respondent FERC at 21.[36]
 
 
 36
 Since CCWD agrees that as an encroaching licensee it must compensate PG & E, the adversely affected prior licensee, even for the de minimis adverse impact in question, and since it is premature for us to decide in what forum that compensation should be fixed or what standards should govern its determination,[37] we need not now decide whether and to what extent compensation is mandated by the FPA, other law, or equitable considerations.
 
 C. Expansion of the Spicer Meadow reservoir
 
 37
 The dam CCWD proposes to build at Spicer Meadow will flood PG & E's existing dam and reservoir at that location. PG & E argues that the terms of the Spicer Meadow dam license issued by the Commission to PG & E in 1951 do not allow FERC to permit construction of a new dam. FERC disagrees. It approved CCWD's proposed dam, but protected PG & E's interest in water currently channeled from the Spicer Meadow reservoir to PG & E powerhouses by issuing CCWD's license "subject to" the provisions of Article 32 of PG & E's Spicer Meadow dam license. J.A. 744.
 
 Article 32 provides, in pertinent part:
 
 38
 In order that this project shall not unreasonably interfere with any other project or part thereof which may hereafter be developed ... the Commission expressly reserves the right at any time ... to grant another license ... authorizing [the new] applicant alone or jointly with the licensee for this project to raise a dam or the dams of this licensed project and to increase the storage capacity of any or all of the reservoirs; provided, that any such authorization shall require: (i) that the licensee for this project shall be adequately protected from or recompensed for any damage, temporary or permanent, which may be caused by the raising of said dam or dams or by the construction of any other works or structures within the area of the project for which license is issued ... (iv) the licensee for this project shall at all times have complete control over storage and release therefrom of any of its waters, whether stored in reservoirs constructed at its own expense, constructed jointly with such other applicant or constructed at [the] expense of such other applicant; ... provided that the licensee for this project shall be indemnified from liabilities and costs involved as in (i), (ii), and (iii) above and shall retain control of its water as in (iv) above.
 
 
 39
 10 F.P.C. at 1186 (emphasis supplied). PG & E points to the first italicized phrase and argues that FERC thereby reserved the right to authorize only the "raising" of existing dams, not the construction of an entirely new one. We think PG & E's reading is crabbed. The three italicized sections of Article 32, sensibly read, indicate that FERC retained authority to permit enlargement of the Spicer Meadow reservoir "to increase the storage capacity," by any appropriate means, means that could include but were not restricted to appropriating and raising PG & E's existing dam.
 
 
 40
 First, the language of Article 32 itself gives little support to PG & E's narrow reading. The most obvious way to "increase the storage capacity" of a reservoir, action authorized by the first italicized passage in Article 32, is to build a higher dam downstream. PG & E's argument would exclude this interpretation by implying the following bracketed word in that passage: "to raise a dam or the dams of this licensed project and [thereby] to increase the storage capacity of any or all of the reservoirs." Such an interpretation renders the last portion of the passage superfluous.[38] It is not readily compatible, moreover, with other portions of Article 32. Both of the other italicized passages, since they form part of a proviso, relate only to actions that increase storage capacity in the manner permitted by the principal provision. Thus, the second italicized passage, when it anticipates "construction of any other works or structures within the area of the project for which [a new] license is issued," must have in mind works or structures for the purpose of increasing reservoir capacity; and the most likely of these is a dam downstream. Similarly, the third italicized passage's reference to "reservoirs ... constructed at [the] expense of [the new licensee]," must allude to reservoirs that "increase the storage capacity of [the existing licensee's] reservoirs"--and this most likely refers to a reservoir that inundates the existing licensee's present dam. Finally, the proviso that the existing licensee "shall at all times have complete control over storage and release ... of any of its waters [whereever stored]" hardly seems necessary if the increase of storage capacity is only to be achieved behind the existing licensee's own raised dam.
 
 
 41
 Elsewhere in the license agreement the parties reiterated their expectation that a subsequent increase in storage capacity effected by another licensee might be authorized, but made no reference to any limitation on the means that might be used to accomplish that purpose. FERC announced in the license its finding that
 
 
 42
 [u]nder present circumstances and conditions ... the project is best adapted to a comprehensive plan for the improvement and utilization of water-power development, and for other beneficial public purposes, including recreational purposes.
 
 
 43
 10 F.P.C. at 1184 (emphasis supplied). In Article 25, which deals with PG & E's duty to clear the bottom of its reservoirs, the parties anticipate, in general terms, an "addition to the reservoir storage capacity by others under a license issued by the Commission." Id. at 1185. Finally, Article 30 of the license provides:
 
 
 44
 In order not to interfere with future comprehensive development of the water power resources of the Stanislaus River watershed, waters stored in project reservoirs shall not be released for use or permitted to be used in the development of power except in existing powerhouses and by existing installations, without the prior approval of the Commission.
 
 
 45
 Id. (emphasis supplied).
 
 
 46
 The body of the license agreement thus reflects the parties' understanding that FERC retained broad authority to permit future development at Spicer Meadow. In sum, we are convinced that Article 32's reference to the raising of PG & E's existing dams was an alternative the license agreement specifically kept open to facilitate future development, not an exclusive means that the parties anticipated PG & E might invoke to impede it.[39] This squares precisely with FERC's interpretation of the license, an interpretation to which we owe deference. Accordingly, we hold that FERC retained the power to authorize CCWD's erection of a new dam, subject to a requirement that PG & E retain its present control[40] over water supplied to the Angels and Murphys powerhouses.[41]
 
 III. CONCLUSION
 
 47
 For the reasons stated, the Commission's orders challenged in the PG & E and CCWD petitions for review are
 
 
 48
 Affirmed.
 
 
 
 *
 A companion decision, issued today, resolves No. 82-2022, Friends of the River v. FERC, 720 F.2d 93. Judge Bazelon, for the reasons stated in his dissenting opinion in Friends of the River, would order a remand, and therefore would not reach the issues raised in the petitions consolidated for decision in this opinion. He has noted, however, that "[w]ere the issues to be reached, [he] would agree with the majority's reasoning." Friends of the River v. FERC, at 110 n. 3 (Bazelon, J., dissenting)
 
 
 [1]
 Section 4(e), 16 U.S.C. Sec. 797(e), charges FERC
 [t]o issue licenses ... for the purpose of constructing, operating, and maintaining dams, water conduits, reservoirs, power houses, transmission lines, or other project works necessary or convenient for the development and improvement of navigation and for the development, transmission, and utilization of power ....
 The Act was, originally, the "Water Power Act," and for many years the Federal Power Commission administered the provisions involved in this case. The two Acts and agencies are not distinguished hereafter in this opinion.
 
 
 [2]
 On that date FERC published an order issuing a license to CCWD for Project 2409. Joint Appendix (J.A.) 727-72. On July 9, 1982, the Commission issued a second order, denying requests for a rehearing made by CCWD, PG & E, NCPA, and Friends of the River and Dale Meyer. J.A. 959-68
 
 
 [3]
 FERC Project No. 2699, 44 F.P.C. 1373 (1970)
 
 
 [4]
 FERC Project No. 2019, 10 F.P.C. 1182 (1951)
 
 
 [5]
 FERC Project No. 2130, 14 F.P.C. 556 (1955)
 
 
 [6]
 The project involves several dams, diversion tunnels, and power plants. Overall, the project would cause the abandonment or removal of three of PG & E's existing dams and two of its conduits. Initial Brief of Petitioner PG & E at 8-9
 
 
 [7]
 According to PG & E's estimates (disputed by CCWD), power generation would be reduced by 91% at Angels, and 87% at Murphys powerhouses. See J.A. 551, 693-94, 699; Joint Initial Brief of the Calaveras County Water District & The Northern California Power Agency [hereafter, CCWD Initial Brief] at 15
 
 
 [8]
 Section 10(a) is set out infra pp. 82-83
 
 
 [9]
 The core of the dispute between CCWD and PG & E is the amount of compensation PG & E will receive: reasonable compensation within FERC's power to determine (if CCWD's view is accepted), or bargained-for compensation for PG & E's utterly unconstrained consent (if PG & E's view of the matter is accepted). PG & E proposed that CCWD be required to supply PG & E with about 34,000 Megawatt-hours (Mwh) of energy annually for the fifty-year life of CCWD's project license, i.e., until 2032; CCWD rejected this as excessive, partly because the Angels license expires in 1995, the Murphys license in 1996, the Stanislaus license in 2005. CCWD Initial Brief at 8-9. Moreover, CCWD disputes PG & E's estimates of the amount of power PG & E will actually lose as a result of CCWD's development. Id. at 15 n. 1
 
 
 [10]
 Section 6 is set out infra p. 83
 
 
 [11]
 See also section 4(e), 16 U.S.C. Sec. 797(e), which authorizes FERC to issue licenses "necessary or convenient for the development and improvement of navigation and ... power ...."
 
 
 [12]
 Section 10(b) provides:
 [E]xcept when emergency shall require for the protection of navigation, life, health, or property, no substantial alteration or addition not in conformity with the approved plans shall be made to any dam or other project works constructed hereunder of an installed capacity in excess of two thousand horsepower without the prior approval of the Commission ....
 16 U.S.C. Sec. 803(b).
 
 
 [13]
 Section 28 provides:
 The right to alter, amend, or repeal this chapter is expressly reserved; but no such alteration, amendment, or repeal shall affect any license theretofore issued under the provisions of this chapter or the rights of any licensee thereunder.
 16 U.S.C. Sec. 822.
 
 
 [14]
 In its Order granting CCWD's license FERC stated:
 The project, as proposed by CCWD, would divert flows that are utilized by Projects Nos. 2019 [Murphys] and 2699 [Angels] for power production. Article 32 of the Project No. 2019 license precludes such diversions without an agreement from PG [&] E. Additionally, inasmuch as these diversions would reduce generation by approximately 90 percent at Angels Project No. 2699, we are precluded by Section 6 from authorizing such diversions with respect to Project No. 2699 because [they] would be tantamount to rendering the projects inoperable. Therefore, this license does not authorize CCWD to use diversions now used by Projects Nos. 2019 and 2699. We do, however, urge CCWD to pursue discussions with PG [&] E regarding the acquisition of the right to these diversions. The increase in generation that would be gained thereby would clearly be consistent with comprehensive development of the water resources involved.
 J.A. 740.
 
 
 [15]
 More precisely, FERC ruled that Article 32 of the Murphys license protects PG & E's water supply to that plant by providing that PG & E "shall at all times have complete control over storage and release ... of any of its waters ...." (The same license covers the Spicer Meadow dam; Article 32 is set out, in pertinent part, infra, p. 91.) The Angels license contains no such provision; FERC therefore invoked section 6 directly as the ground for protecting PG & E's water supply to the Angels plant. See supra note 14
 
 
 [16]
 Article 59 of CCWD's license provides:
 The Licensee ... shall attempt to negotiate a settlement with [PG & E] on the adequate compensation for the effects of [the project] on PG & E's licensed projects. The settlement shall provide compensation to PG & E for appropriate damages attributable to the proposed North Fork Stanislaus River Project No. 2409. If the Licensee and PG & E cannot reach settlement within six months from the date of issuance of this license, the Commission reserves the right to determine the appropriate compensation, after notice and opportunity for hearing.
 J.A. 754. The six-month deadline has expired; negotiations continue, and FERC has given no indication that it is about to intervene, terminate negotiations, and adjudicate the controversy itself.
 
 
 [17]
 Susquehanna cited as authority three prior FPC decisions. None in fact provided significant support for the proposition asserted in the quoted passage. In City of Seattle, Washington, 26 F.P.C. 54, 61 (1961), the Commission did require a licensee to negotiate with a prior licensee to compensate for losses resulting from encroachment by the new project. Id. But the encroachment in question was an estimated 2.5 foot increase of the water level downstream of the already licensed project, id. at 102, a de minimis encroachment comparable to the effect of CCWD's project on PG & E's Stanislaus powerhouses. See infra p. 22. In P.U.D. No. 1 of Douglas County, Washington, 28 F.P.C. 128, 132 (1962), the Commission approved an encroachment on an existing government project. The encroachment was apparently not opposed by the affected agency. In P.U.D. No. 2 of Grant County, Washington, 28 F.P.C. 718 (1962), the licensee did not object to a plan altering project fishways
 Other FERC decisions are equally inapposite. Town of Madison Electric Works Dep't, 11 FERC p 61,318 (1980), involved a potential conflict between an existing and proposed project, but FERC determined that provisions in the prior license allowed for future development by a different licensee within the boundary of the previously licensed project. In Tuolumne County Water District No. 2, 19 FERC p 61,173 (1982), PG & E intervened in a preliminary application proceeding, and contended that the proposed project would adversely affect two of PG & E's existing licensed facilities. FERC's preliminary review indicated that there would be no "substantial alteration" of PG & E's existing projects, and the Commission therefore deferred further consideration of PG & E's protest to future licensing proceedings.
 
 
 [18]
 The Sixty-sixth Congress debated the FPA in the House between June 27 and July 1, 1919, and in the Senate, between December 6, 1919, and January 15, 1920. Those debates contain almost no discussion of the import of section 6. The House Report, H.R.Rep. No. 61, 66th Cong., 1st Sess. (1919), is equally uninformative. But one question that was heatedly debated, especially in the Senate, is revealing. The debate revolved around FPA sections 14 & 15, 16 U.S.C. Secs. 807-08, which provide that at the expiration of a license term the United States may take over an existing project, renew the license, or license a new licensee. Many Senators were concerned that even at that stage the prior licensee might be able to veto any new licensee's application, thus securing an effectively perpetual license unless the United States itself chose to take over the works. The vigorous debate on the precise phrasing of section 15 to foreclose that possibility unambiguously reveals Congress' view that prior to the expiration of the new license the Commission would have no power to transfer authority to a new licensee
 CCWD would attach great significance to this exchange on the floor of the House in the early debates of the Sixty-sixth Congress:
 Mr. White of Maine. [I]s ... there ... any limitation on the authority of the commission to issue these licenses for the construction of dams? The particular question I have in mind is whether they would have authority to authorize the construction of a dam which would throw out some existing and going structure up the stream?
 Mr. Esch [Chairman of the House Special Committee on Water Power]. That could only be done by paying whatever damages the construction of such a dam would entail.
 Mr. White of Maine. But they can then proceed and issue a license which would mean the obliteration of an existing plant upon the payment of damages?
 Mr. Esch. There are many provisions in this bill giving the commission power to grant licenses to such applicants as will best develop the water powers of the region, and with such power granted to the commission it might be that they would grant a license to a lower builder of a dam, even though it might entail loss to the upper owner of a dam. Of course it would be subject to the payment of damages. I doubt, however, whether the commission would exercise such power to any considerable extent.
 Mr. White of Maine. But the fact is that they would have that power under this bill?
 Mr. Esch. I know of nothing in the bill that would take that power away.
 
 
 [58]
 Cong.Rec. 2,035 (1919). CCWD's reliance on this colloquy is misplaced. It is clear, in context, that Representative White was concerned about projects antedating the proposed legislation, not projects licensed by the new Commission after the legislation came into effect. His question was asked in connection with FPA section 4, dealing with the Commission's general power to issue licenses, not section 6, which places limitations on that power, and the entire tenor of this tentative exchange suggests that Representative Esch had in mind only the possible condemnation of pre-FPA facilities. Only in that light did Representative Esch's answers make sense--section 6 and the rest of the FPA offered no protection to unlicensed facilities developed before 1920; indeed, section 23(a), 16 U.S.C. Sec. 816, specifically provided that the FPA did not "confirm[ ] or otherwise affect[ ] ... any authority heretofore given ...."
 
 
 [19]
 CCWD argues that the diversion of water to a new FERC licensee does not affect a "project works," and therefore does not "alter[ ]" a license. Accordingly, CCWD concludes, FPA section 6 does not govern the matter. CCWD Initial Brief at 33. FERC presents similar arguments with respect to the Stanislaus powerhouse dispute. See infra note 31. The Commission suggests that in granting a license it does not allocate or guarantee the continuation of water rights to licensees, see FPA section 27, 16 U.S.C. Sec. 821; therefore it may license diversion of waters except to the extent that the diversion would render a portion of the project works substantially inoperable. However accurate FERC's view may be in the context of water rights disputes between a licensee and another claimant asserting water rights not conferred by FERC, or between a licensee and the forces of nature ultimately responsible for the provision of water, it is plain that when FERC grants a license without appropriate reservation, FERC does undertake not to license other projects that will substantially alter the supply of water to the prior licensee without its consent. Section 6 would be virtually valueless if it protected only the bricks and mortar of a facility and a minimal level of operation
 
 
 [20]
 A major section of CCWD's Initial Brief argues: "[T]he [FPA] Provides an Orderly and Clear Licensing Process, Subject to Provisions to Protect the Licensee's Investment." CCWD Initial Brief at 26-35
 
 
 [21]
 Section 10(c) provides in pertinent part:
 Each licensee hereunder shall be liable for all damages occasioned to the property of others by the construction, maintenance, or operation of the project works or of the works appurtenant or accessory thereto, constructed under the license and in no event shall the United States be liable therefor.
 16 U.S.C. Sec. 803(c). Whether or not another FERC license is "property" (elsewhere in its brief CCWD argues that it is not), section 10(c)'s plain purpose is to ensure that licensees, not the United States, bear the full costs of their projects. We have found no indication that Congress expected section 10(c) to be the vehicle for authorizing interlicense encroachment conditioned on the payment of compensation. (We note, however, FERC's view that under section 10(c) it may require a subsequent licensee to compensate a prior one for insubstantial encroachments that do not amount to an "alteration" of the prior license. See FERC Order Denying Rehearing, J.A. 965-66.)
 Section 10(f), 16 U.S.C. Sec. 803(f), would directly support CCWD's position, but for the fact that it explicitly addresses benefits conferred by one licensee's project on another's, not burdens. That section provides, in pertinent part:
 [W]henever any licensee is directly benefited by the construction work of another licensee ... the Commission shall require as a condition of the license that the licensee so benefited shall reimburse the owner of such reservoir or other improvements ....
 16 U.S.C. Sec. 803(f).
 Section 21 is equally unhelpful. It provides:
 When any licensee cannot acquire by contract or pledges an unimproved dam site or the right to use or damage the lands or property of others necessary to the construction, maintenance, or operation of any dam, reservoir, diversion structure, or the works appurtenant or accessory thereto, in conjunction with any improvement which in the judgment of the commission is desirable and justified in the public interest ... it may acquire the same by the exercise of the right of eminent domain in the district court of the United States for the district in which such land or other property may be located, or in the State courts....
 16 U.S.C. Sec. 814. Again, neither its explicit language nor the legislative history suggests that this section was viewed by Congress as an exception to the consent requirement elsewhere stated in the same legislation. Moreover, CCWD has not requested exercise of a right of eminent domain against PG & E.
 
 
 [22]
 Section 10(a), 16 U.S.C. Sec. 803(a)
 
 
 [23]
 According to CCWD, FERC's application of section 6 to the dispute over the Angels-Murphys water "permits the holder of a pre-existing license to veto further development, by refusing its assent to a substantial alteration to its license project ...." CCWD Initial Brief at 31, citing North Kern Water Storage Dist., 16 FERC (CCH) p 61,082 (1981). "By the Commission's rationale, the holder of a license for a 1 MW earthen dam project could block a 1000 MW project clearly better adapted for the nation's purposes, a situation only slightly more extreme than that presented here." CCWD Initial Brief at 32
 
 
 [24]
 Cf. infra note 33
 
 
 [25]
 16 U.S.C. Sec. 807(a). CCWD points out that under our construction of section 6, facilities subject to condemnation under state or federal law "with some considerable time and effort" may not be impaired in like manner by FERC. CCWD Initial Brief at 34. We do not find this duality anomalous. Private investors in real property are almost always exposed to the risk of condemnation by the state; appropriate procedural safeguards usually make that risk tolerable. In the FPA, Congress preserved the states' and the United States' powers to condemn projects but chose not to add to investor uncertainty by giving FERC equivalent authority exercisable in relatively informal Commission proceedings
 
 
 [26]
 Even where matters proximately affecting the public interest are not at stake, courts sometimes find an implicit requirement of reasonableness in contractual provisions that subject one party's action to consent or agreement by the other. See, e.g., Contra Costa County Flood Control & Water Conservation Dist. v. United States, 512 F.2d 1094, 1097, 206 Ct.Cl. 413 (1975). Such an inference is at least no less appropriate in the interpretation of government licenses:
 [W]hen private rights of an indefeasible nature are sought to be derived from regulatory provisions ... the case is peculiarly one for the application of the universal rule that grants of special franchises and privileges are to be strictly construed in favor of the public right, and nothing is to be taken as granted concerning which any reasonable doubt may be raised.
 Louisville Bridge Co. v. United States, 242 U.S. 409, 417, 37 S.Ct. 158, 159, 61 L.Ed. 395 (1917).
 
 
 [27]
 CCWD argues that PG & E's consent to diversion of the Angels-Murphys water has, in any event, been granted. CCWD Initial Brief at 44-51. The Angels and Murphys project licenses contain standard provisions in which FERC reserves the right to order future changes in operations "in the interest of the fullest practicable conservation and utilization of such waters for power purposes and for other beneficial public uses ...." Angels license Art. 5 (standard provision), 40 F.P.C. at 1448; Murphys license Art. 13, CCWD Initial Brief, Appendix C at 17. CCWD would read into these clauses, which largely repeat FPA section 10(a), PG & E's advance consent to CCWD's project. In connection with another project FERC has construed these standard license conditions to permit the Commission only to order capacity additions by the licensee, not to license new encroaching projects. North Kern Water Storage Dist., 16 FERC p 61,082 (1981). Moreover, CCWD's argument here is untimely: CCWD concedes it failed to raise this issue in the Commission proceeding, see CCWD Initial Brief at 46 n. 1; we decline to consider it further in this review proceeding
 
 
 [28]
 PG & E states that the loss will "cost[ ] as much as $100,000 per year." Initial Brief of Petitioner PG & E at 38-39 (footnote omitted)
 
 
 [29]
 In the Order accompanying the grant of CCWD's license, and in Article 59 of the license itself, FERC "reserve[d] the right to determine the appropriate compensation after notice and opportunity for hearing." J.A. 742, 754. In its Order Denying Rehearing FERC added: its "reservation ... will allow this Commission to determine what compensation we will require CCWD, as licensee, to provide to PG & E. There may be some determinations of compensation on which the Commission may wish to defer to another forum." J.A. 965
 
 
 [30]
 The rigid reading of section 6 proposed by PG & E would, for the future, simply invite a new boilerplate clause in every license agreement, a clause in which FERC reserved its right to permit minor encroachments
 
 
 [31]
 We do not accept FERC's argument that in section 6, "alteration of a 'license' means a physical change in a facility." Brief for Respondent FERC at 14. FERC itself appears to reject that construction in the context of the dispute over the Angels-Murphys water supplies. We are of the view that when FERC issues a license covered by section 6 it tacitly undertakes not to issue other licenses that will significantly interfere with operations already licensed, whether the interference will adversely affect the prior licensee's physical plant, its "project works," or its supplies of water. See supra note 19. FERC does not guarantee water supplies, see FPA section 27, 16 U.S.C. Sec. 821, but that does not mean FERC remains free to reallocate the water supplies of licensed operations
 
 
 [32]
 We note that FPA section 10(b), 16 U.S.C. Sec. 803(b), prohibits licensees from making "substantial" alterations or additions to a project without prior FERC approval. Congress plainly recognized that licensees must be given discretion to effect small changes in the course of day-to-day operations. But in drafting section 6, Congress apparently overlooked FERC's parallel need to allow de minimis encroachments on extant licenses that may result from other licensing decisions. The oversight is unsurprising; section 6's focus is on the direct threat of unilateral FERC or licensee decisions to modify an existing license or depart from its terms, not on the indirect encroachment of one license on another. Cf. Alabama Power Co. v. FPC, 482 F.2d 1208, 1215 (5th Cir.1973); Niagara Mohawk Power Corp. v. FPC, 202 F.2d 190, 197-98 & n. 3 (D.C.Cir.1952), aff'd, 347 U.S. 239, 74 S.Ct. 487, 98 L.Ed. 686 (1954)
 PG & E points out that in connection with section 10(b) FERC has defined "substantial alteration" to mean a "decrease in efficiency" or a "material increase in cost." Initial Brief of Petitioner PG & E at 36. PG & E considers it significant that the raising of the water level downstream of its Stanislaus powerhouse meets that definition. Id. We do not find PG & E's view persuasive. Though we hold that section 6 admits a de minimis exception similar to that expressly created by the "substantial alteration" language of section 10(b), the purposes of the two sections are quite different; what has a minimal impact upon the one does not necessarily have only a minimal impact on the other. Section 6 is designed to promote stable financial expectations among investors; section 10, on the other hand, is immediately designed to assure, among other things, that the public obtains the generated power that marks the purpose of the license.
 
 
 [33]
 If a loss of 2700 Mwh per year were a large fraction of PG & E's Stanislaus powerhouse capacity, and PG & E adamantly refused every reasonable offer of compensation for that loss, we would be forced to address the issue left open in Part A, above--we would have to decide whether a "substantial" loss to PG & E of 2700 Mwh per year could be allowed to block the 560,000 Mwh per year output of the CCWD project
 
 
 [34]
 We note in this regard that a sharp disagreement between CCWD and PG & E on appropriate compensation with respect to the Angels and Murphys plants turned in part on their different estimates of future water supplies to the powerhouses in question. CCWD Initial Brief at 15 n. 1; J.A. 687
 
 
 [35]
 We do not suggest that an annual loss of tens of thousands of dollars is in all respects relevant to FPA administration "insubstantial." We emphasize only that in the context of a project generating revenues several hundred times as great, the risk at stake is not the type likely to influence decisions to invest
 
 
 [36]
 We do not, however, adopt FERC's view that only "substantial alterations" in a license engage section 6 protections, largely because that test, as FERC articulates it, seems entirely circular. FERC has stated:
 The term "substantial alteration" has been used over the years to describe those instances when a proposed action which in some way would affect or interfere with a licensed project was considered to be of such a magnitude that it could require the alteration of an existing license, which pursuant to section 6 would require the consent of the existing licensee.
 Order Denying Rehearing, J.A. 965. Perhaps recognizing that this statement does not aid in delineating the type of license alterations that require section 6 consent, FERC continued:
 Even if we dispense with use of the term "substantial" in conjunction with alterations of license[s] covered by Section 6, we would still have to define what types of actions which in some way affect a licensed project require the "alteration" of an existing license and thus invoke the protections of Section 6.
 Id. at 966. With this we agree.
 
 
 [37]
 PG & E asserts that FERC does not have jurisdiction to set compensation. Initial Brief of Petitioner PG & E at 28. FERC takes the position that it has jurisdiction to determine if it has jurisdiction, and urges us to withhold review of the entire compensation question until it has made at least that threshold determination. Brief for Respondent FERC at 48-49. NCPA (and, by implication, CCWD) dismisses this matter as "an insubstantial quarrel over the particular procedures by which PG & E is entitled to obtain its remedy." Brief of the NCPA Intervenor, in Support of Respondent at 50
 On this point there is plainly no controversy yet ripe for review. Cf. Cities of Anaheim & Riverside v. FERC, 692 F.2d 773, 777-78 (D.C.Cir.1982).
 
 
 [38]
 Interpreting the latter portion of the passage as authorizing inundation of the existing dam does not render the first portion of the passage superfluous. Specific authorization would reasonably be thought necessary to enable a third party to enter upon and modify the licensee's dam structure
 
 
 [39]
 If the facts had been reversed--if the license agreement had contained no reference to raising PG & E's dam, and CCWD had proposed to do so--we would undoubtedly hear the argument that FERC retained authority to license a new dam, but had no power to permit a subsequent licensee to take over PG & E's existing structure. In the context of PG & E's entire license agreement we believe that Article 32 mentioned raising the existing dam to foreclose any such argument by PG & E, not to limit FERC's options when licensing a subsequent development
 
 
 [40]
 PG & E suggests that its control can be adequately protected only if the new development is restricted to raising the old dam. This claim is both unsubstantiated and implausible. We see no reason why two large organizations like CCWD and PG & E cannot, under FERC's supervision, arrive at an accommodation that will secure PG & E's "control" of its water while allowing CCWD to build and operate the new dam
 
 
 [41]
 In light of our reading of Article 32 we need not address FERC's further argument that it is authorized to license a new dam simply because raising the old one would be unsafe